204 P.3d 243 (2009)
Lee H. ROUSSO, an individual, Appellant,
v.
STATE of Washington, a government entity, Respondent.
No. 61779-6-I.
Court of Appeals of Washington, Division 1.
March 23, 2009.
*244 Lee H. Rousso, Green & Rousso PLLC, Renton, WA, for Appellant.
Jerry A. Ackerman, H. Bruce Marvin, Assistant Attorney General, Olympia, WA, for Respondent.
DWYER, A.C.J.
¶ 1 Lee Rousso is an amateur poker enthusiast. He enjoys playing poker in virtual card rooms on the Internet. After the legislature *245 amended the state Gambling Act[1] by inserting the words "the internet" in the act's nonexclusive list of media through which the transmission of "gambling information" is prohibited,[2] Rousso sought a declaratory judgment that the amendments impermissibly interfere with Congress's authority to regulate interstate and international commerce. The superior court entered summary judgment in the State's favor and Rousso appeals. Because the State's established interest in regulating gambling outweighs the burdens that the Gambling Act imposes on interstate and international commerce, we affirm.

I
¶ 2 Rousso brought this action seeking to have the recent amendments to the Gambling Act declared facially unconstitutional. The State does not dispute his standing to bring this suit. The relevant background, then, is not that related to Rousso's poker playing; instead, the relevant background is the legal history that prompted Rousso to bring this challenge, and the procedural history of this action after he did so. Both are straightforward.
¶ 3 In 2005, former RCW 9.46.240 provided that "[w]hoever knowingly transmits or receives gambling information by telephone, telegraph, radio, semaphore, or similar means, or knowingly installs or maintains equipment for the transmission or receipt of gambling information shall be guilty of a gross misdemeanor."
¶ 4 The legislature amended former RCW 9.46.240 in 2006. Substitute Senate Bill 6613[3] inserted the words "the internet" and "a telecommunications transmission system" in the nonexclusive list of media through which the transmission of "gambling information" is prohibited. The amendments also made the transmission of gambling information a class C felony. The amending legislation included an express statement of purpose:
It is the policy of this state to prohibit all forms and means of gambling, except where carefully and specifically authorized and regulated. With the advent of the internet and other technologies and means of communication that were not contemplated when either the gambling act was enacted in 1973, or the lottery commission was created in 1982, it is appropriate for this legislature to reaffirm the policy prohibiting gambling that exploits such new technologies.
LAWS OF 2006, ch. 290, § 1. The amendments took effect on June 7, 2006.
¶ 5 "Gambling information" is defined by the Gambling Act as "any wager made in the course of and any information intended to be used for professional gambling." RCW 9.46.0245. "Professional gambling," in turn, includes any conduct in which a "person pays a fee to participate in a card game." RCW 9.46.0269(1)(b). It also includes conduct in which a person, "[a]cting other than as a player ... materially aids any form of gambling activity." RCW 9.46.0269(1)(a).
¶ 6 There is no dispute that both Rousso and the operators of the Internet card room that Rousso favors, Pokerstars, would be engaged in the transmission and receipt of gambling information under the amended act, were Rousso to play poker for money, after June 7, 2006, on Pokerstars.
¶ 7 Thus, after the 2006 amendments took effect, Rousso brought this action pursuant to the state Uniform Declaratory Judgments Act.[4] Rousso sought a declaration that the amendments were "unconstitutional and ... therefore void and unenforceable." He asserted various theories in support of his requested relief but only one remains at issue in this appeal: his assertion that the act impermissibly interferes with Congress's authority to regulate interstate and international commerce pursuant to article 1, section 8, *246 clause 3 of the United States Constitution, the Commerce Clause.[5]
¶ 8 The trial court denied Rousso's motion for a declaratory judgment, while granting the State's motion for a summary judgment of dismissal.
¶ 9 Rousso appeals.

II
¶ 10 "Review of a grant of summary judgment is de novo." Bostain v. Food Express, Inc., 159 Wash.2d 700, 708, 153 P.3d 846, cert. denied, ___ U.S. ___, 128 S.Ct. 661, 169 L.Ed.2d 512 (2007). A legislative act is presumptively constitutional, "`and the party challenging it bears the burden of proving it unconstitutional beyond a reasonable doubt.'" State v. Heckel, 143 Wash.2d 824, 832, 24 P.3d 404 (2001) (quoting State v. Brayman, 110 Wash.2d 183, 193, 751 P.2d 294 (1988)).

III
¶ 11 In both the trial court and this court, Rousso's briefing focuses on his assertion that a dormant Commerce Clause analysis dictates the outcome of this dispute. The State disagrees, averring that a dormant Commerce Clause analysis is not even applicable. According to the State, this is so because Congress has specifically authorized state laws regulating Internet gambling, rendering them "invulnerable to constitutional attack under the Commerce Clause."[6] This being so, according to the State, the only question presented is whether the Gambling Act conflicts with these federal laws, and so is preempted. The State's analysis, however, is severely flawed. Although various federal laws affect Internet gambling in one way or another, Congress has not expressly authorized otherwise unconstitutional state laws regulating Internet gambling.
¶ 12 Several basic principles of the dormant Commerce Clause doctrine must be recited in order to explain why it is that the State seeks to entirely preclude examination of the Gambling Act under that doctrine. "The Commerce Clause of the Constitution grants Congress the power `[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.'" Maine v. Taylor, 477 U.S. 131, 137, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (quoting U.S. CONST. Art. I, § 8, cl. 3). "`Although the Clause thus speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade.'" Taylor, 477 U.S. at 137, 106 S.Ct. 2440 (quoting Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 35, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980)). In other words, under the dormant Commerce Clause doctrine, a validly enacted state law may run afoul of Congress's legislative supremacy even when Congress has not legislated on the subject matter of the state law  i.e., when the clause's grant of legislative power to Congress is "dormant"  if that law intrudes upon Congress's constitutional prerogative to regulate trade between the states and with foreign nations.
¶ 13 The State primarily relies on two federal appellate opinions in support of its assertion that Congress has spoken on the issue of Internet gambling and, as such, the Congress's power is no longer "dormant," precluding application of the dormant Commerce Clause doctrine to this dispute. The first is the United States Supreme Court's decision in Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System, 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985). The second is the Third Circuit's decision in Pic-A-State PA, Inc. v. Pennsylvania, 42 F.3d 175 (3d Cir.1994).
¶ 14 Northeast Bancorp addressed the ability of states to enter into reciprocal state compacts governing out-of-state bank holding companies' ownership of in-state banks. As relied upon by the State, it is relevant for its ruling that, while "[t]here can be little dispute that the dormant Commerce Clause *247 would prohibit a group of States from establishing a system of regional banking by excluding bank holding companies from outside the region if Congress had remained completely silent on the subject," that was not the case in light of a federal statute's allowance that states could "plainly authorize[ ]" out-of-state holding company acquisitions. Ne. Bancorp, 472 U.S. at 174, 105 S.Ct. 2545. The court held that, under such circumstances, "the commerce power of Congress is not dormant, but has been exercised," and precludes any Commerce Clause challenge to the federally authorized state banking law. Ne. Bancorp, 472 U.S. at 174, 105 S.Ct. 2545.
¶ 15 Pic-A-State addressed a different situation. In that case, the state of Pennsylvania had passed a law that imposed criminal penalties on any person who purchased out-of-state lottery tickets, for a fee, on behalf of Pennsylvania residents. Pic-A-State, 42 F.3d at 177. A Pennsylvania business engaged in that business, Pic-A-State, challenged the law as invalid under the Commerce Clause. Pic-A-State, 42 F.3d at 177. After the entry of a trial court decision favorable to Pic-A-State, however, Congress enacted legislation that directly prohibited the cross-border sale of lottery ticket purchasing and redemption  i.e., precisely the conduct criminalized by the challenged Pennsylvania law. Pic-A-State, 42 F.3d at 177-78.
¶ 16 Based on the passage of the federal legislation, the Third Circuit reversed the trial court's decision in Pic-A-State's favor. The court applied the long-standing rule that "in those instances where Commerce Clause challenges to state regulation have been mounted in an area where Congress has made it a crime to conduct such commerce, the courts have conducted only a two-fold inquiry, asking (1) whether federal law precludes all state legislation in that area, and (2) if state regulation is not precluded, whether the state statute conflicts with the federal provision." Pic-A-State, 42 F.3d at 179-80 (citing California v. Zook, 336 U.S. 725, 733, 69 S.Ct. 841, 93 L.Ed. 1005 (1949); Asbell v. Kansas, 209 U.S. 251, 255-56, 28 S.Ct. 485, 52 L.Ed. 778 (1908)).
¶ 17 According to the State, Northeast Bancorp and Pic-A-State mandate the conclusion that Congress has "already spoken" in the area of Internet gambling regulation and has expressly authorized legislation such as the Gambling Act amendments. Thus, according to the State, Rousso's constitutional challenge to those amendments is precluded by federal statute. In effect, the State points to two scenarios in which congressional action is sufficient to warrant the determination that the Commerce Clause is no longer "dormant": (1) situations in which Congress has expressly authorized states to engage in regulation that, absent congressional authorization, would violate the Commerce Clause, and (2) circumstances in which Congress has criminalized certain conduct, and the challenged state law independently criminalizes identical conduct. The problem with the State's reliance on these scenarios is that neither applies here.
¶ 18 None of the federal statutes cited by the State provide the type of express authorization for otherwise unconstitutional regulation that was provided by the statute at issue in Northeast Bancorp. Instead, the laws upon which the State relies are all of types that the United States Supreme Court has rejected as being sufficiently unambiguous to preclude Commerce Clause challenges. The State relies in particular on two federal statutes, neither of which has the effect that the State claims: the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA), 31 U.S.C. §§ 5361-67, and the Wire Act, 18 U.S.C. § 1084.
¶ 19 The UIGEA primarily prohibits "person[s] engaged in the business of betting or wagering" from knowingly accepting various forms of electronic payment or credit from any person participating "in unlawful Internet gambling." 31 U.S.C. § 5363. The statute specifically defines "unlawful Internet gambling" as transmitting wagers by any means that "involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law." 31 U.S.C. § 5362(10)(A) (emphasis added). In short, the UIGEA prohibits businesses like Pokerstars (to the extent that they are subject to federal criminal jurisdiction) from accepting funds from any person *248 who, by engaging in gambling activities, breaks federal or state gambling laws.
¶ 20 The Wire Act, in turn, prohibits the transmission, through the use of wire communication facilities, of wagers "in interstate or foreign commerce." 18 U.S.C. § 1084(b). Congress's purpose in enacting the Wire Act was to aid in the suppression of organized crime by "assist[ing] the various States ... in the enforcement of their laws pertaining to gambling." H.R.REP. No. 87-967, reprinted in 1961 U.S.C.C.A.N. 2631.
¶ 21 It is true that the federal statutes cited by the State envision state laws that regulate gambling. It is also true that at least one of them, the UIGEA, anticipates that persons who gamble on the Internet may violate state laws by doing so. It does not follow, however, that the federal statutes provide an "unambiguous statement" of congressional intent to allow state regulation of Internet gambling. The problem with reading such legislation as the State would have us read it  as a blanket authorization for states to regulate Internet gambling without respect to the limits imposed by the Commerce Clause  is that it has long been the rule that Congress must "manifest its unambiguous intent before a federal statute will be read to permit or to approve ... a violation of the Commerce Clause." Wyoming v. Oklahoma, 502 U.S. 437, 458, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (emphasis added) (citing Taylor, 477 U.S. at 139, 106 S.Ct. 2440; S.-Cent. Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 91, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984)). This is entirely consistent with the United States Supreme Court's recent reiteration that "clear congressional intent" is required to depart from the principle "that discrimination against out-of-state goods is disfavored." Granholm v. Heald, 544 U.S. 460, 482, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005).
¶ 22 There is no such unambiguous manifestation of congressional intent in either the UIGEA, the Wire Act, or any of the other federal statutes to which the State cites. Most of the laws cited by the State  for example, the Wire Act  were passed long before the advent of the Internet, and have not since been amended. Laws passed long before the Internet existed can hardly be said to demonstrate an "unambiguous intent" on the part of Congress to allow otherwise unconstitutional Internet regulation by the states.
¶ 23 The only federal statute cited by the State that has anything to do with the Internet  the UIGEA  likewise cannot credibly be interpreted as an announcement of Congress's intent to authorize state Internet regulation that would otherwise infringe on Congress's Commerce Clause power. To provide an illustrative scenario: suppose that, far in its past, a state enacted a law prohibiting its residents from wagering with one another on the outcome of sporting events, and also prohibited anyone from facilitating such wagers. Suppose also that, disregarding this law, a resident of the state were to decide to facilitate bets on various sporting events in exchange for a percentage of the pot. Suppose further that, being both enterprising and technologically sawy, this bookmaker were to choose to utilize a PayPal button on a website to accept wagers made by payments from his local customers' credit card accounts.
¶ 24 This enterprising criminal would certainly be violating the state bookmaking statute. He would also be violating the UIGEA. His conduct would be unlawful under the state statute regardless of the fact that the method of his violation  accepting bets on the Internet  was not contemplated at the time of the state statute's passage. The conclusion from this is that the UIGEA provides a federal prohibition on the violation of state (or federal) gambling laws by use of the Internet, regardless of whether those laws themselves regulate the Internet. In other words, its focus is not on state Internet gambling laws at all and, indeed, does not necessarily contemplate that the state laws whose enforcement it assists will have anything to do with the Internet. It certainly does not constitute a clear statement that the gambling laws whose enforcement it assists may discriminate against out-of-state commerce or regulate out-of-state conduct. This being the case, the UIGEA can hardly be read to manifest Congress's "unambiguous intent ... to permit or to approve ... a violation of the *249 Commerce Clause." Wyoming, 502 U.S. at 458, 112 S.Ct. 789.
¶ 25 Pic-A-State's rule  parallel state and federal criminalization of specific conduct  is equally inapplicable here. As illustrated by the discussion above, the UIGEA is not parallel to the state Gambling Act. It does not itself criminalize transmission of gambling information; it only prohibits the use of the Internet to transfer funds in circumstances where doing so already violates another state, federal, or tribal law. The Wire Act is similarly inapplicable. As Rousso correctly points out, that statute has, in fact, never been interpreted by a court as a federal prohibition on Internet gambling. None of the other federal laws cited by the State constitute such a prohibition, either.
¶ 26 The State's contention that the UIGEA makes violation of a state law a "predicate offense" for its enforcement, and so disposes of Commerce Clause analysis under Perrin v. United States, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979), is even further off base. First, Perrin did not involve a Commerce Clause challenge to a state law at all; it involved the interpretation of a federal criminal statute. Perrin, 444 U.S. at 38, 100 S.Ct. 311. Second, to read Perrin in the way that the State would have us read it  that any incorporation of state law by reference in a federal criminal statute constitutes Congressional authorization of state legislation that would otherwise violate the Commerce Clause  is directly contradictory to one of the Court's most significant dormant Commerce Clause opinions. Maine v. Taylor itself involved dormant Commerce Clause analysis of a state law in a prosecution under a federal statute incorporating that law by reference. Taylor, 477 U.S. at 132-33, 106 S.Ct. 2440. Presumably, if the state law had been directly authorized by the federal law, the Court's detailed and extensive Commerce Clause analysis would have been wholly unnecessary.
¶ 27 In sum, the State "identifies nothing in the text or legislative history of the [statutes cited] that suggests Congress wished to validate state laws that would be unconstitutional without federal approval." Taylor, 477 U.S. at 139, 106 S.Ct. 2440.

IV
¶ 28 Because the State is incorrect in its assertion that Congress has expressly authorized laws such as the Gambling Act amendments, it is necessary to address Rousso's Commerce Clause challenge. Dormant Commerce Clause doctrine is consistently articulated, if not always consistently applied. Under a proper application of the doctrine, Rousso's challenge fails.
¶ 29 The fundamental principle underlying the dormant Commerce Clause doctrine is that "the states impermissibly intrude on this federal power when they enact laws that unduly burden interstate commerce." Heckel, 143 Wash.2d at 832, 24 P.3d 404. This being the case, "[a]nalysis of a state law under the dormant Commerce Clause generally follows a two-step process. We first determine whether the state law openly discriminates against interstate commerce in favor of intrastate economic interests. If the law is facially neutral, applying impartially to in-state and out-of-state businesses, the analysis moves to the second step, a balancing of the local benefits against the interstate burdens." Heckel, 143 Wash.2d at 832, 24 P.3d 404. "When a state statute clearly discriminates against interstate commerce, it will be struck down ... unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.... Indeed, when the state statute amounts to simple economic protectionism, a `virtually per se rule of invalidity' has applied." Wyoming, 502 U.S. at 454-55, 112 S.Ct. 789 (quoting Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)).
¶ 30 Here, Rousso vigorously contends that the Gambling Act amendments clearly discriminate against interstate and international commerce. According to Rousso, this is so because the amended Gambling Act restricts Washington poker players to in-state brick and mortar card rooms, instead of allowing them to gamble on the Internet with players who might be located in other states or countries. Indeed, Rousso insinuates that the legislature's stated justifications for the *250 Gambling Act  to minimize "the close relationship between professional gambling and organized crime" and to "safeguard the public against the evils induced by common gamblers... engaged in professional gambling"[7]  are mere subterfuge as applied to the 2006 amendments, and that the real purpose of the amendments was to protect Washington card rooms from Internet competition.[8]
¶ 31 There are various problems with Rousso's proposed analysis. The first, and most obvious, is that the Gambling Act amendments are facially neutral  they apply equally to gambling information transmitted over the Internet whether such transmission occurs solely between Washington residents or businesses, or instead occurs between Washington residents or businesses and residents or businesses located in other states or countries. In other words, Rousso would be equally guilty of violating RCW 9.46.240 were he caught playing Internet poker with Spokane residents on a website owned by a Seattle business and hosted on a Tacoma server as he would be were he caught playing poker on Pokerstars (a non-U.S. corporation) with residents of Minnesota, Montana, and Moldova.
¶ 32 The second (and decisive) problem with Rousso's contention is that our Supreme Court rejected an identical argument in Heckel. In that case, which concerned a state consumer protection law prohibiting deceptive email messages, the court concluded that the law was not "per se invalid" because it "applie[d] evenhandedly to in-state and out-of-state spammers." Heckel, 143 Wash.2d at 833, 24 P.3d 404. The Gambling Act amendments are likewise indiscriminate in their application to Internet gamblers.
¶ 33 This being the case, it is well established that whether the Gambling Act amendments can survive dormant Commerce Clause scrutiny depends on the balancing test articulated by the United States Supreme Court in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):
Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
That is, we must decide whether the burdens imposed by the Gambling Act are "clearly excessive" in relation to the State's interest in regulating gambling.
¶ 34 At the outset, it is critical to recognize that, contrary to Rousso's implication, Washington has from its inception considered gambling to be an activity with significant negative effects and has always strictly regulated gambling in order to minimize those effects. For example, article II, section 24 of the state constitution provided in its original form that "[t]he legislature shall never authorize any lottery."[9] Even a cursory review of Washington's legal history shows that, contrary to Rousso's contention, this opprobrium has in no way been limited to ticket lotteries. Rather, all "`gaming'" generally has long been considered to fall "`within the category of social and economic evils'" that are the natural subject of government regulation. State ex rel. Schafer v. City of Spokane, 109 Wash. 360, 362, 186 P. 864 (1920) (quoting Ex parte Dickey, 76 *251 W.Va. 576, 85 S.E. 781, 782 (1915)). Indeed, our Supreme Court has expressly held that the term "lottery" in the initial version of article II, section 24 was not limited to ticket lotteries at all, but instead extended to slot machines and, by implication, other games of chance. State ex rel. Evans v. Bhd. of Friends, 41 Wash.2d 133, 145, 247 P.2d 787 (1952).
¶ 35 Rousso disputes that Evans's holding extends to poker, but beyond generally impugning the State's reliance on the case, fails to supply a single citation to Washington authority in support of this assertion. That authority which does exist strongly supports the conclusion that the exercise of some knowledge or skill in a particular game of chance has never been viewed as a distinction worthy of recognition with respect to the types of gambling that require strict government oversight. See RCW 9.46.0225 ("`Contest of chance,' as used in this chapter, means any contest, game, gaming scheme, or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein."); see also State v. Robey, 74 Wash. 562, 564, 134 P. 174 (1913) ("playing poker for money is a game of chance"); Paradise, Inc. v. Pierce County, 124 Wash.App. 759, 771, 102 P.3d 173 (2004) (countywide ban on card room gambling "is undeniably the exercise of police power").[10]
¶ 36 Put simply, Washington has a longstanding and legitimate interest in tightly controlling gambling. That interest is a pure exercise of the traditional police power, and is justified by the State's desire to safeguard its citizens both from the harms of gambling itself and from professional gambling's historically close relationship with organized crime. The next two questions, then, are (1) whether, given the significance of this interest, the addition of the term "internet" to the Gambling Act creates a burden on interstate commerce that is "clearly excessive," and (2) whether the State's interest can be equally well accommodated by less restrictive regulations.
¶ 37 Addressing the second question first, it is doubtful that the State can effectively address the problems associated with Internet-based gambling without regulating the Internet itself. For example, it is questionable whether the State has the ability to effectively prevent underage Washington residents from Internet gambling without directly regulating the transmission of gambling information; to do so would require the State to discern when residents are engaged in gambling over the Internet (likely from within their homes), and further discern the age of the gambler  all without violating residents' privacy rights. Similarly, it is doubtful that the State can effectively monitor Internet-based criminal behaviors that are traditionally associated with gambling  for example, money laundering  if it is precluded from enacting any regulation that touches upon the Internet.
¶ 38 For purposes of the Pike balancing test, then, the State has established that regulating Internet gambling furthers important interests. Moreover, those interests cannot be adequately protected without regulating the Internet. This being so, the resolution of this case hinges upon a single question: whether the burdens that the Gambling Act imposes on interstate and international commerce are clearly excessive in relation to the State's interests. Both Rousso and the State approach this question as if it were simple. But it is not simple.
¶ 39 This is so because of the different effects of the Gambling Act on Washington residents, like Rousso, and out-of-state businesses, like Pokerstars. There is no question that the Gambling Act would be constitutional if it regulated only Rousso's conduct. The problem arises because the act also purports to impose criminal liability on Internet gambling businesses that are neither located *252 in Washington nor actively solicit wagers from Washington residents.[11]
¶ 40 This implicates "two `unsettled and poorly understood' aspects of the dormant Commerce Clause analysis," the dual Commerce Clause prohibitions on legislation that unduly "(1) create[s] inconsistency among the states and (2) regulate[s] conduct occurring wholly outside of Washington." Heckel, 143 Wash.2d at 837, 24 P.3d 404 (quoting Jack L. Goldsmith & Alan O. Sykes, The Internet and the Dormant Commerce Clause, 110 YALE L.J. 785, 789 (2001)). Our Supreme Court has adopted the rationale proffered by two prominent academic commentators to explain and remedy the inconsistent case law applying these dormant Commerce Clause tests to the Internet: namely, that "[t]he inconsistent-regulations test and the extraterritoriality analysis are appropriately regarded as facets of the Pike balancing test." Heckel, 143 Wash.2d at 837, 24 P.3d 404 (citing Goldsmith & Sykes, supra, at 808).
¶ 41 Under this approach, one line of cases proceeds from the assumption that "[t]he nature of the Internet makes it impossible to restrict the effects" of Internet regulation to the regulating state. Am. Libraries Ass'n v. Pataki, 969 F.Supp. 160, 177 (S.D.N.Y.1997). Under this view, practically any state law that affects the Internet is unconstitutional, because "the Commerce Clause precludes a state from enacting legislation that has the practical effect of exporting that state's domestic policies." Am. Libraries, 969 F.Supp. at 174. Numerous cases have followed this approach, usually, like American Libraries, in relation to the dissemination of obscene material. See PSINet, Inc. v. Chapman, 362 F.3d 227, 239-40 (4th Cir.2004); Am. Booksellers Found. v. Dean, 342 F.3d 96, 102-04 (2d Cir.2003); Am. Civil Liberties Union v. Johnson, 194 F.3d 1149, 1161-62 (10th Cir. 1999); Cyberspace Comm'ns, Inc. v. Engler, 55 F.Supp.2d. 737, 751-52 (E.D.Mich.1999), aff'd and remanded, 238 F.3d 420 (6th Cir. 2000).
¶ 42 The subject of this case being a federal constitutional provision, there is no question that we are bound to follow the relevant decisions of the United States Supreme Court. "We have greater latitude," however, "when analyzing the decisions of the various federal appellate [or trial] courts." S.S. v. Alexander, 143 Wash.App. 75, 92, 177 P.3d 724 (2008). "[W]e are properly guided by the principles of law announced in the most well-reasoned of the decisions we have reviewed. We are not, however, bound to follow a holding of a lower federal court merely because it was announced as such." S.S., 143 Wash.App. at 92-93, 177 P.3d 724.
¶ 43 The American Libraries approach has been persuasively and widely criticized as resting "on an impoverished understanding of the architecture of the Internet," "misread[ing] dormant Commerce Clause jurisprudence," and "misunderstand[ing] the economics of state regulation of transborder transactions." Goldsmith & Sykes, supra, at 787. See also Note, Laura Vanderstappen, Internet Pharmacies and the Specter of the Dormant Commerce Clause, 22 WASH. U.J.L. & POL'Y 619; Recent Development  The Dormant Commerce Clause and the Internet, 17 HARV. J.L. & TECH. 296 (2003) (criticizing Am. Booksellers, 342 F.3d 96). More importantly, numerous other cases (many addressing practically identical subjects) have either rejected outright American Libraries' fundamental premise, or distinguished American Libraries as overbroad. See Ford Motor Co. v. Texas Dep't of Transp., 264 F.3d 493, 502-03 (5th Cir.2001); Hatch v. Superior Court, 80 Cal.App.4th 170, 193-94, 94 Cal. Rptr.2d 453 (2000); Cashatt v. State, 873 So.2d 430, 436 (Fla.Ct.App.2004); People v. Foley, 94 N.Y.2d 668, 674, 709 N.Y.S.2d 467, 731 N.E.2d 123 (2000); State v. Backlund, 672 N.W.2d 431, 436-37 (N.D.2003); State v. Snyder, 155 Ohio App.3d 453, 467-68, 801 N.E.2d 876 (2003).
¶ 44 Our Supreme Court in Heckel also distinguished American Libraries. 143 Wash.2d at 839-40, 24 P.3d 404. Problematically for this case, however, the basis upon *253 which the court did so was that the statute at issue in Heckel applied only to people who initiated email communication, not to the "creation of websites." 143 Wash.2d at 839, 24 P.3d 404. The Gambling Act, on the other hand, does apply to passive websites like Pokerstars. Thus, Heckel does not answer the question presented here.
¶ 45 But Heckel does point in the right direction. That is, Heckel relies heavily on the commentary of Goldsmith and Sykes, supra, the central conclusion of which is that those formulations of the dormant Commerce Clause doctrine that preclude all state regulation of Internet conduct are overbroad. Heckel's approval of this central principle is self-evident; even if the opinion distinguished the rationale in American Libraries, rather than rejecting that case outright, the Heckel court's resolution of the dormant Commerce Clause issue assumed the State's ability to regulate the Internet.
¶ 46 Moreover, the commentary relied upon by the Heckel court illustrates why many of the concerns expressed in American Libraries are based on incorrect assumptions. These errors are especially telling in relation to Internet gambling. For example, the commentary demonstrates the relative ease by which an Internet business can determine the geographical location from which on-line wagers are placed based on the Internet protocol (IP) address of the computer used to place them. Goldsmith & Sykes, supra, at 810-11. Further, as the commentary illustrates in extensive detail, "it is common for firms doing business in the United States to incur costs learning about and complying with fifty state regulations.... Absent a showing that the local regulation is excessive under the balancing test, ... there should be no further concern about inconsistent Internet regulations." Goldsmith & Sykes, supra, at 823.
¶ 47 Here, the regulation is not excessive. Indeed, it is worth giving special attention to the fact that the prohibited conduct here at issue  the transmission of professional gambling information  has been forbidden since the initial passage of the Gambling Act in 1973. The initial act listed various technologies through which the transmission of gambling information was then prohibited, including "telephone, telegraph, radio, [and] semaphore." RCW 9.46.240. Rousso does not contend that transmission of gambling information through these media unconstitutionally impairs Congress's ability to regulate commerce.
¶ 48 Instead, he bases his case on the idea that the Internet, as a technological medium for transmitting information, is so novel that special rules apply to it, rendering unconstitutional any state law that subjects it to regulation. Put bluntly, this is a simplistic understanding of the technology at issue, which, at its core, performs precisely the same functions as the "telephone, telegraph, radio, [or] semaphore"  the transmission of information over distance  only does so more quickly, cheaply, and efficiently. This being so, we decline to follow those cases that view the Internet as entirely off-limits to state regulation. Rather, the question is whether the burdens on commerce that the regulation imposes are "clearly excessive" in relation to the interests that the regulation seeks to serve.
¶ 49 Ultimately, given the importance of the State's interests in protecting its citizens from the ills associated with gambling, and the relatively small cost imposed on out-of-state businesses by complying with the Gambling Act, Rousso has failed to meet his burden of showing that the Gambling Act is "clearly excessive."
¶ 50 Affirmed.
WE CONCUR: COX and LEACH, JJ.
NOTES
[1] Ch. 9.46 RCW.
[2] Laws of 2006, ch. 290, § 2. Section 3 of the amending legislation also prohibited the sale of lottery tickets over the Internet.
[3] SUBSTITUTE S.B. 6613, 59th Leg., Reg. Session (Wash.2006).
[4] RCW 7.24.020.
[5] U.S. CONST. Art. I, § 8, cl. 3: "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."
[6] Ne. Bancorp, Inc. v. Bd. of Governors of the Fed. Reserve Sys., 472 U.S. 159, 174, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985).
[7] Laws of 1973, ch. 218, § 1.
[8] The legislative history suggests otherwise. Beyond the fairly straightforward (and clearly articulated) goal of bringing the Gambling Act into the 21st century, it appears that the 2006 amendments were enacted, at least in part, to preclude legal claims that the State was required to authorize electronic scratch ticket machines, and to strengthen the State's bargaining position in gaming compact negotiations with tribal governments. See S.B. REP. on Substitute S.B. 6613, 59th Leg., Reg. Sess. (Wash.2006).
[9] Article II, section 24 was amended in 1972 to authorize lotteries "upon the affirmative vote of sixty percent of the members of each house of the legislature or ... by referendum or initiative approved by a sixty percent affirmative vote of the electors voting thereon."
[10] Rousso does cite to an Oregon opinion authored before Evans, State v. Coats, 158 Or. 122, 74 P.2d 1102 (1938), for the proposition that because poker involves some skill, it is not a pure game of chance and thus is not a "lottery." Rousso provides nothing that indicates that Washington has followed Oregon's lead in making this distinction. On the contrary, both statute and case law make clear that Washington has not.
[11] To be entirely clear: Rousso is not challenging the Gambling Act amendments on behalf of Pokerstars, or anyone other than himself. He nonetheless is entitled seek a declaration that the act violates the Commerce Clause, however, because if it does, his personal interest in engaging in Internet gambling is likewise impaired by unconstitutional legislation.