239 P.3d 1084 (2010)
Lee H. ROUSSO, Petitioner,
v.
STATE of Washington, Respondent.
No. 83040-1.
Supreme Court of Washington, En Banc.
Argued May 27, 2010.
Decided September 23, 2010.
*1086 Lee Howard Rousso, The Law Office of Lee H. Rousso, Seattle, WA, for Petitioner.
Jerry Alan Ackerman, H. Bruce Marvin, Office of the Attorney General, Olympia, WA, for Respondent.
Jeffrey L Fisher, Roger Ashley Leishman, Davis Wright Tremaine, L.L.P., Seattle, WA, amicus counsel for Cheryl Blake, John Blake, Rob Esene & Jim Gauley.
Paul Douglas Swanson, Lane Powell PC, Seattle, WA, Thomas C. Goldstein, Issac J. Lidsky, Jonathan H. Eisenman, Akin Gump Strauss Hauer & Feld, L.L.P., Washington, DC, amicus counsel for Poker Players Alliance.
SANDERS, J.
¶ 1 The question before this court is not whether Internet gambling, including playing poker on-line, should be illegal. That determination is reserved to the legislature, and the legislature addressed the issue by enacting and amending RCW 9.46.240, which criminalizes the knowing transmission and reception of gambling information by various means, including use of the Internet. Since sending and receiving gambling information is illegal, Internet gambling in the state of Washington is effectively banned.[1]
¶ 2 It is not the role of the judiciary to second-guess the wisdom of the legislature, which enacted this ban. The court has no authority to conduct its own balancing of the pros and cons stemming from banning, regulating, or openly permitting Internet gambling. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 470, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) ("[I]t is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature."); Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963) *1087 ("[C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.").
¶ 3 The only issue before this court is whether Washington's ban on Internet gambling is an unconstitutional infringement of the dormant commerce clause. See U.S. Const. art. I, § 8, cl. 3. The commerce clause grants Congress the authority "[t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Id. The Supreme Court interpreted a dormant commerce clause from this text, reasoning since Congress has the power to regulate interstate commerce, states are precluded from doing so by enacting laws or regulations that excessively burden interstate commerce. E.g., Maine v. Taylor, 477 U.S. 131, 137, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986).
¶ 4 Determining whether Washington's ban on Internet gambling violates the dormant commerce clause is a multistep analysis. Outlined briefly, we must first determine whether Congress has granted the states authority to regulate Internet gambling. If it has, the dormant commerce clause does not apply and RCW 9.46.240 is upheld. See Ne. Bancorp, Inc. v. Bd. of Governors, 472 U.S. 159, 174, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985).
¶ 5 If Congress has not, the dormant commerce clause applies, and we must determine (a) whether the language of the statute openly discriminates against out-of-state entities in favor of in-state ones or (b) whether the direct effect of the statute evenhandedly applies to in-state and out-of-state entities. Bostain v. Food Express, Inc., 159 Wash.2d 700, 718, 153 P.3d 846 (2007).
¶ 6 If the statute does not openly discriminate and applies evenhandedly, it does not violate the dormant commerce clause if (1) there is a legitimate state purpose and (2) the burden imposed on interstate commerce is not "`clearly excessive'" in relation to the local benefit. State v. Heckel, 143 Wash.2d 824, 832-33, 24 P.3d 404 (2001) (quoting Franks & Son, Inc. v. State, 136 Wash.2d 737, 754, 966 P.2d 1232 (1998)); accord Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).
¶ 7 If the statute openly discriminates or does not apply to in-state and out-of-state entities evenhandedly, it is upheld only if it is necessary to achieve an important state interest unrelated to economic protectionism. Mt. Hood Beverage Co. v. Constellation Brands, Inc., 149 Wash.2d 98, 110, 63 P.3d 779 (2003) (citing New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 274, 276, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)).

FACTS AND PROCEDURAL HISTORY
¶ 8 Lee Rousso, a Washington resident, gambled by playing poker on-line and wishes to do so again, but Washington law prohibits it. Rousso sought a declaratory judgment that RCW 9.46.240 is unconstitutional, arguing the statute violates the dormant commerce clause as a state regulation impermissibly burdening interstate and international commerce. The trial court granted summary judgment in favor of the State, holding the statute is constitutional. The Court of Appeals affirmed. Rousso v. State, 149 Wash. App. 344, 347, 204 P.3d 243, review granted, 166 Wash.2d 1032, 217 P.3d 337 (2009).

ANALYSIS

I. Has Congress expressly authorized the state regulation of Internet gambling?
¶ 9 Congress has the authority to regulate matters affecting interstate commerce and also the authority to delegate such regulation to the states. See Ne. Bancorp, Inc., 472 U.S. at 174, 105 S.Ct. 2545. If Congress grants the states authority to regulate a certain matter, a state's regulation is consistent with the commerce clause. Id. "[B]ecause of the important role the Commerce Clause plays in protecting the free flow of interstate trade," Congress' delegation of that authority must be "`unmistakably clear.'" Taylor, 477 U.S. at 138-39, 106 S.Ct. 2440 (quoting South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 91, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984)).
¶ 10 Here, the State argues two Congressional acts manifest "unmistakably clear" *1088 intent to delegate to the states the authority to regulate on-line gambling. Neither of these acts manifests such intent. The acts cited recognize and expressly preserve a state's authority to criminalize some or all gambling activities within the state's borders, but nothing more.
¶ 11 The Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA), codified as 31 U.S.C. §§ 5363-5367, prohibits any person engaged in the business of gambling from accepting money in any form for participation in unlawful Internet gambling. Id. § 5363. The UIGEA recognizes that some types of bets are rendered unlawful under state law, id. § 5362(10)(A), and clarifies that it does not alter any state gambling laws, id. § 5361(b). Nowhere does the UIGEA permit the states to regulate gambling activities outside their borders or without regard to the commerce clause.
¶ 12 The federal wire act of 1961 (Wire Act) criminalizes the use of wire communication facilities[2] to place bets through interstate or foreign commerce. 18 U.S.C. § 1084(a). The Wire Act then clarifies it does not prevent transmission of information assisting the placement of bets from a state where the bet is legal to another state where it is legal. 18 U.S.C. § 1084(b). Again, the Wire Act recognizes the states' authority to regulate the type of gambling permitted within its borders, but does not delegate any authority to regulate interstate commerce with impunity.
¶ 13 Congress has not delegated to the states its authority to regulate interstate Internet gambling. The dormant commerce clause is applicable here, as the Court of Appeals correctly held. See Rousso, 149 Wash.App. at 351-57, 204 P.3d 243.

II. Does RCW 9.46.240,[3] by its language or effect, discriminate against interstate commerce in favor of in-state economic interests?
¶ 14 Because a statute that discriminates against interstate commerce is subject to heavier scrutiny under the dormant commerce clause, we must first determine whether RCW 9.46.240 discriminates in its language or direct effect.[4]See, e.g., Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); Bostain, 159 Wash.2d at 718, 153 P.3d 846. Here, the language of RCW 9.46.240 is not discriminatory; it equally prohibits Internet gambling regardless of whether the person or entity hosting the game is located in Washington, another state, or another country.
¶ 15 Neither does RCW 9.46.240 have a direct discriminatory effect on interstate commerce. The statute prohibits Internet gambling evenhandedly, regardless of whether the company running the web site is located in or outside the state of Washington. See Brown-Forman Distillers Corp., 476 U.S. at 579, 106 S.Ct. 2080. The effects imposed on in-state and out-of-state entities engaging or that would engage in Internet gambling are the same. See CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 87-88, *1089 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); Clover Leaf Creamery Co., 449 U.S. at 471-72, 101 S.Ct. 715. RCW 9.46.240 is not discriminatory under the dormant commerce clause.
¶ 16 Rousso argues RCW 9.46.240 is discriminatory because the Internet gambling ban excludes Internet gambling web sites, all of which are out-of-state businesses,[5] from the Washington market while leaving untouched an alternative servicein-state, "brick and mortar" (i.e., where individuals are physically present) gambling businesses. This argument misconstrues and misapplies the test under the dormant commerce clause in several ways.
¶ 17 First, Rousso misapprehends what constitutes a direct discriminatory effect on interstate commerce. The question is how the effects of the ban are imposed on in-state and out-of-state entities, not what the effect is on those entities' revenue. The ban on Internet gambling has the same effect on all entities, regardless of origin: a ban on the transfer of gambling information via the Internet.
¶ 18 The Supreme Court addressed this distinction in CTS Corp., 481 U.S. 69, 107 S.Ct. 1637. There, state regulations hindering hostile takeovers of Indiana companies were deemed nondiscriminatory because they imposed the same effects on in-state and out-of-state entities. 481 U.S. at 87-88, 107 S.Ct. 1637. It was immaterial to the Court's consideration that the majority of entities seeking to effectuate a hostile takeover of an Indiana corporation were out-of-state, and thus the law, as applied, would affect out-of-state entities more often. Id. at 88, 107 S.Ct. 1637.
¶ 19 Second, Rousso alleges direct discrimination because banning Internet gambling will have a secondary effect of promoting in-state, Internet gambling substitutes such as brick and mortar gambling. But this misses the mark on two counts. Internet gambling and brick and mortar gambling are two different activities, presenting risks and concerns of a different nature, and creating different regulatory challenges; a state can regulate different activities differently. The dormant commerce clause only prevents a state (under most circumstances)[6] from discriminating based on whether the business is in-state or out-of-state. Again, RCW 9.46.240 treats all entities engaging in Internet gambling equally, regardless of origin.
¶ 20 Furthermore, the discriminatory effect under this analysis must be direct. Brown-Forman Distillers, 476 U.S. at 579, 106 S.Ct. 2080; Bostain, 159 Wash.2d at 718, 153 P.3d 846. Here, the ban on Internet gambling has a direct effect on Internet gambling operations, preventing them from doing business in Washington. Rousso argues this ban has an effect on a substitute service brick and mortar gamblingbecause individuals will gamble at casinos if they are unable to gamble on-line. But an increase of business for another industry is not a direct effect of the ban; the ban makes no mention nor imposes any regulation on brick and mortar gambling. This alleged secondary effect on brick and mortar gambling will also occur for any goods or services a person might purchase or use instead of banned Internet gamblingwhether a person instead engages in on-line stock trading, buys more snacks for an in-person poker game among friends, or signs up for cello lessons. Increased revenues for in-state banks, snack producers and grocery stores, and music teachers would also constitute "discriminatory effects" under Rousso's argument, but again, these are secondary effects. Purchasing substitute goods and services does not constitute direct discriminatory effects.
¶ 21 The Supreme Court rejected a secondary effects argument in Clover Leaf Creamery Co., 449 U.S. 456, 101 S.Ct. 715. There, the Minnesota legislature banned the retail sale of milk in plastic nonreturnable, nonrefillable containers yet permitted sale in *1090 paperboard ones. Id. at 458, 101 S.Ct. 715. The state has a large pulpwood industry but no plastic industry, so the plastic ban would shift some business from the wholly out-of-state plastic market to in-state pulpwood businesses. Id. at 460, 101 S.Ct. 715. Nevertheless the statute was not discriminatory under the dormant commerce clause because it precluded the use of plastic milk containers regardless of origin. See id. at 471-72, 101 S.Ct. 715. The favorable in-state, secondary effect on the pulpwood industry did not render the ban discriminatory under the dormant commerce clause.
¶ 22 The discriminatory language or direct effect step of the dormant commerce clause weeds out laws that regulate by virtue of whether a business is in-state or out-of-state. It ferrets out "simple protectionism." See id. at 471, 101 S.Ct. 715. RCW 9.46.240 applies based upon whether an individual regardless of originis engaged in Internet gambling operations. The statute does not directly discriminate against out-of-state businesses in favor of in-state ones.

III. Is the burden on interstate commerce "clearly excessive" in relation to a legitimate state interest?
¶ 23 Because neither the language nor direct effect of RCW 9.46.240 is discriminatory, the statute does not violate the dormant commerce clause if (a) there is a legitimate state purpose and (b) the burden imposed on interstate commerce is not "clearly excessive" in relation to the local benefit, considering also whether the local interest could be promoted in a way that would impose a lesser impact on interstate commerce. Heckel, 143 Wash.2d at 832-33, 24 P.3d 404; accord Pike, 397 U.S. at 142, 90 S.Ct. 844.

a. State interest and burden on interstate commerce
¶ 24 The State wields police power to protect its citizens' health, welfare, safety, and morals. On account of ties to organized crime, money laundering, gambling addiction, underage gambling, and other societal ills, "[t]he regulation of gambling enterprises lies at the heart of the state's police power." Johnson v. Collins Entm't Co., 199 F.3d 710, 720 (4th Cir.1999); see also Edmonds Shopping Ctr. Assocs. v. City of Edmonds, 117 Wash.App. 344, 352, 71 P.3d 233 (2003).
¶ 25 Internet gambling introduces new ways to exacerbate these same threats to health, welfare, safety, and morals. Gambling addicts and underage gamblers have greater accessibility to on-line gamblingable to gamble from their homes immediately and on demand, at any time, on any day, unhindered by in-person regulatory measures. Concerns over ties to organized crime and money laundering are exacerbated where on-line gambling operations are not physically present in-state to be inspected for regulatory compliance. Washington has a legitimate and substantial state interest in addressing the effects of Internet gambling.
¶ 26 RCW 9.46.240 imposes a burden on interstate commerce by walling off the Washington market for Internet gambling from interstate commerce. The extent of this burden is mitigated somewhat. First, the ban does not prevent or hinder Internet gambling businesses from operating throughout the rest of the world. Second, those businesses can easily exclude Washingtonians. If an individual during registration marks his or her location as the state of Washington, the gambling web site can end the registration there. Nevertheless, preventing Internet gambling businesses from having access to Washington consumers who would otherwise patronize those businesses still has a considerable impact on interstate commerce. This burden on interstate commerce is comparable to the substantial state interest stemming from the State's police power to protect the health, welfare, safety, and morals of its citizens.[7]

*1091 b. Is the burden on interstate commerce "clearly excessive" in relation to a legitimate state interest?
¶ 27 Since the burden on interstate commerce is comparable to the state benefit, the final question is whether that burden is "clearly excessive" in relation to the state interest. Pike, 397 U.S. at 142, 90 S.Ct. 844; Heckel, 143 Wash.2d at 832-33, 24 P.3d 404. The phrase "clearly excessive" carries with it a sense of "too much"that is, whether the burden is clearly unnecessary to achieve the state interest, whether that same interest could be protected in another way while imposing a lesser burden on interstate commerce. We thus consider whether the State clearly could avoid threats to health, welfare, safety, and morals posed by Internet gambling equally as well in a manner that imposed less of a burden on interstate commerce.
¶ 28 Rousso argues regulating Internet gambling is a less restrictive alternative. This falls short of the mark because (1) it is not clear regulation could avoid concerns over Internet gambling as well as a complete ban and (2) it is not clear, even if regulation providing comparable protection is possible, the burden on interstate commerce would be decreased through that regulation. See Clover Leaf Creamery Co., 449 U.S. at 473-74, 101 S.Ct. 715 (alternatives were rejected because they were "either more burdensome on commerce ... or less likely to be effective...").
¶ 29 Internet gambling has its own unique dangers and pitfalls. A regulatory system to monitor and address concerns unique to Internet gambling would take significant time and resources to develop and maintain. Even so, no regulatory system is perfect. Some concerns will not be fully addressed, while loopholes may permit others to slip through the cracks. The legislature decided to avoid the shortcomings and ongoing process of regulation by banning Internet gambling altogether. The legislature could have decided to step out in the rain with an umbrella, but instead it decided to stay home, dry, and without the possibility that its umbrella would break a mile from home. The judiciary has no authority to second-guess that decision, rebalancing public policy concerns to determine whether it would have arrived at a different result. Under the dormant commerce clause, we observe only that it is not clear that regulation of Internet gambling could protect state interests as fully as, or at least in a comparable way to,[8] a complete ban.
¶ 30 Moving on to the interstate commerce burden, Washington regulation of Internet gambling would be an interstate-commerce burdening nightmare. Washington heavily regulates brick and mortar gambling operations for the protection of its citizens and to assure financial regularity. As one example, the State can inspect the premises and audit the books of a brick and mortar gambling operation without notice, RCW 9.46.130, for compliance with all regulations, including assuring the State has criminal background checks for all employees working at that time, RCW 9.46.070(7), and the gambling operation has implemented measures to counter *1092 pathological gambling, RCW 9.46.071,.072.
¶ 31 Even assuming there is an equally effective, Internet equivalent to Washington's brick and mortar regulations, Washington would need to impose its regulatory requirements and intrusive vigilance on foreign[9] on-line operations to regulate foreign Internet gambling. The very structure and practice of those foreign operations would need to be reorganized in conformity to Washington regulations. When a foreign operation failed to conform, all Washington commerce on that web site would be precluded.
¶ 32 And when the conflict is not with only one web site, but also the regulations of the country of origin of that web site, that country would be blacklisted from Washington on-line gambling. Where Washington blocks commerce with specific countries based upon state determinations of the adequacy of the country's regulations or conduct, it is likely to run afoul of the federal government's power to make treaties under article II, section 2, clause 2 of the United States Constitution. See, e.g., Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 380-81, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (striking down a Massachusetts law that restricted state purchase of goods from companies in Burma (Myanmar) due to the state-sanctioned, mass genocide that continues to occur there). Washington regulation of foreign service providers is also likely to run afoul of various international treaties.[10]
¶ 33 Regulation of Internet gambling comparable to that currently imposed on brick and mortar gambling would require Washington to export its considerable regulations to the worlda major burden on interstate commerce. See S. Pac. Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 775, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (a state limiting the length of trains would have the effect of exporting that regulation to other states, where train cars would be split up and reassembled to decrease or increase the length of the train prior to and upon leaving that state, causing a "serious impediment to the free flow of commerce ..."); accord Am. Libraries Ass'n v. Pataki, 969 F.Supp. 160, 177 (S.D.N.Y. 1997) (a state projecting its laws into other states via regulation of Internet activity is a per se violation of the commerce clause). Comparable regulations on Internet gambling are not clearly less restrictive on interstate commerce.[11]
¶ 34 Rather than impose its pervasive regulation on Internet gambling, Washington could permit Internet gambling without regulating it at all or, as Rousso suggested at oral argument, Washington could trust in the regulatory systems of the native countries of the Internet gambling web sites to protect Washington citizens. But whether either of these options would address the concerns of Internet gambling as effectively as a complete ban is not clearly established here, nor could it be.
¶ 35 Rousso's suggestionthat the court force the legislature to trust in the regulatory systems of other countriesnot only bulldozes any notion of a separation of powers between the judiciary and the legislature, but also prevents the legislature from affording any real protection to Washington citizens. *1093 If a country's gambling regulations were inadequate, Washington would either have to endure the social ills it causedpermitting its citizens to be exploited, scammed, or made unwilling participants of money laundering schemesor attempt to run the gambit of selectively banning certain countries from interacting with Washington citizens, running afoul of article II, section 2, clause 2 and various international treaties, as discussed above.
¶ 36 Amicus Curiae The Poker Players Alliance champions the position that Washington can regulate Internet gambling itself, encouraging remand to the trial court for further proceedings to show that since other jurisdictions have had "success" with regulating Internet poker, Washington can too. But what constitutes "success" is a fundamental public policy determination, reserved to the legislature. Even if on remand Rousso were able to produce reports or studies stating some jurisdictions regulate Internet gambling in a manner that addresses gambling addiction, underage gambling, money laundering, and organized crime issues with success comparable to Washington brick and mortar regulation, the trial court would then need to determine (a) whether the findings from those reports and studies were reliable and outweighed contrary findings; (b) whether and to what extent such regulation could be budgeted for and implemented by Washington; and (c) whether gambling would increase due to the ready availability of gambling on a home computer, whether that increase would exacerbate current concerns e.g., causing individuals to go into debt, and increasing gambling addictions, underage gambling, and the prevalence of gambling in society, and whether such increases were "acceptable." These purely public policy determinations demonstrate why the legislature, and not the judiciary, must make that call. See Clover Leaf Creamery Co., 449 U.S. at 470, 101 S.Ct. 715; Ferguson, 372 U.S. at 729, 83 S.Ct. 1028 ("Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation.").
¶ 37 Indeed, the judiciary's making such public policy decisions would not only ignore the separation of powers, but would stretch the practical limits of the judiciary. See Brown v. Owen, 165 Wash.2d 706, 718-19, 206 P.3d 310 (2009) (recognizing the separation of powers implicit in the Washington Constitution and the relevance of justiciability concerns like those addressed by the federal political question doctrine) (citing Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). This court is not equipped to legislate what constitutes a "successful" regulatory scheme by balancing public policy concerns, nor can we determine which risks are acceptable and which are not. These are not questions of law; we lack the tools. Rousso, "in order to succeed in this action, ask[s] the Court to enter upon policy determinations for which judicially manageable standards are lacking." Baker, 369 U.S. at 226, 82 S.Ct. 691. Such is beyond the authority and ability of the judiciary.
¶ 38 This is not to imply the dormant commerce clause can be satisfied any time the State invokes the magic words: "public policy determination." But here there is a legitimate public interest. The ban on Internet gambling is a public policy balance that effectively promotes that interest. A reasonable person may argue the legislature can balance concerns for personal freedom and choice, state finance, and the protection of Washington citizens in a "better" waybut he or she must do so to the legislature.
¶ 39 In contrast the fatal flaw of nondiscriminatory state laws struck down under the dormant commerce clause is often the state law's failure to actually protect the targeted state interest. In Bibb v. Navajo Freight Lines, 359 U.S. 520, 525-29, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959), the Supreme Court held a state law requiring trucks to use curved mudflapswhen flat ones were permitted in all other statesfailed because (1) out-of-state trucks having to pull over at the border and change their mudflaps was a substantial burden to interstate commerce and (2) curved mudflaps provided no safety benefits over straight ones and caused increased risks by increasing the heat around the truck's tires.
*1094 ¶ 40 In Pataki, a New York law banned anyone from transmitting sexually explicit content to minors. 969 F.Supp. at 163. Since a person who posts something on a web site has no way of excluding visitors by geographic region, he or she could not prevent a New York minor from accessing his or her web site. Thus, a web site operator would need to remove the content for all users regardless of geographic regionto comply with the New York law, causing a substantial burden on interstate commerce. And yet, although web site operators from other states within the United States might remove sexually explicit content from their web sites for fear of New York prosecution, foreign web site operatorsfar outside the practical reach of New York prosecutionwould not be so deterred. Id. at 178. The court reasoned that the law failed to protect minors from sexually explicit content because those minors could just as easily view foreign pornographic web sites after domestic web sites were sanitized. Id.
¶ 41 Unlike in Bibb and Pataki, Rousso fails to show a ban on Internet gambling is useless to address legitimate state interests, including reducing underage gambling, compulsive gambling, and Washingtonians' unintentional support of organized crime and money-laundering operations.
¶ 42 The facts and holding in Clover Leaf Creamery Co. bear some constructive similarities to the case at hand. See 449 U.S. 456, 101 S.Ct. 715. There the Minnesota legislature banned the retail sale of milk in plastic nonreturnable, nonrefillable containers because they presented a solid waste management problem, caused energy waste, and depleted natural resources. Id. at 458, 101 S.Ct. 715. Other nonreturnable, nonrefillable containers, such as ones made from paperboard, raised similar concerns but were not banned. Id. Here, both brick and mortar gambling and Internet gambling pose many of the same threats to citizens' health, welfare, safety, and morals, yet only the latter is banned.
¶ 43 Even though plastic and paperboard nonreturnable, nonrefillable containers caused the same ultimate ills, the Supreme Court in Clover Leaf Creamery Co. held the ban on plastic containers, which still permitted paperboard containers, was consistent with the dormant commerce clause. Id. at 473, 101 S.Ct. 715. Two aspects of this holding, discussed in the context of an equal protection claim and then adopted into the dormant commerce clause analysis, see id., are directly applicable here.
¶ 44 First, the Minnesota legislature was permitted to ban plastic without banning paperboard even if this ban granted an in-state benefit. Id. at 473-74, 101 S.Ct. 715. Although both caused solid waste, energy, and conservation issues (particularly in comparison to recyclable containers), plastic nonreturnable, nonrefillable containers were fairly new to the market, had already become popular, and many Minnesota dairies were preparing to switch to their use. Id. at 465-67, 101 S.Ct. 715. Furthermore, the nature and extent of the solid waste, energy, and conservation issues differed between plastic and paperboard containers. Id. at 466-67, 101 S.Ct. 715. The plastic container ban stemmed the proliferation of a growingly popular substitute for recyclable containers, id. at 465-67, 101 S.Ct. 715, thus limiting the solid waste, energy, and conservation issues, id. at 467, 101 S.Ct. 715.
¶ 45 Just as plastic and paperboard containers produce different wastes to different extents, both brick and mortar and Internet gambling threaten health, safety, welfare, and morals in different ways and to different extents. Internet gambling provides a means of gambling that is growing in popularity and immediately accessible at home. The Washington legislature can ban it to limit the threat to health, safety, welfare, and morals caused by gambling, even if it doesn't ban all gambling, as the Minnesota legislature was not compelled to ban all types of nonrecyclable containers. See id. at 465-67, 473, 101 S.Ct. 715. The Washington legislature is permitted to find that Internet gambling's growing popularity, home-accessibility, and regulatory challenges would undermine Washington's policy to "`prohibit all forms and means of gambling, except where carefully and specifically authorized and regulated.'" RCWA 9.46.240 Notes (quoting Laws of 2006, ch. 290, § 1).
*1095 ¶ 46 Second, the Supreme Court in Clover Leaf Creamery Co. held the Minnesota legislature's ban on plastic nonreturnable, nonrefillable containers was consistent with the dormant commerce clauseincluding that it was not "clearly excessive" and alternatives could not address the issues more effectively and with less of an interstate commerce burdeneven though evidence existed that contradicted the legislature's findings that plastic containers caused more of a waste and energy problem than paperboard ones. Id. at 469-70, 101 S.Ct. 715. In fact the Minnesota Supreme Court found that plastic containers required less energy to make and took up less space in landfills. Id. Nevertheless, the United States Supreme Court held, regardless of whether the legislature's findings were based upon weak or inconclusive evidence, that these findings did not open the door for the judiciary to substitute its judgment for the legislature's. Id. at 469-70, 101 S.Ct. 715.
¶ 47 Here, the legislature balanced public policy concerns and determined the interests of Washington are best served by banning Internet gambling. The legislature chose the advantages and disadvantages of a ban over the advantages and disadvantages of regulation. The evidence is not conclusive. Many may disagree with the outcome. But the court has no authority to replace the legislature's choice with its own. Under the dormant commerce clause, the burden on interstate commerce is not "clearly excessive" in light of the state interests. RCW 9.46.240 does not violate the dormant commerce clause.

CONCLUSION
¶ 48 It is the role of the legislature, not the judiciary, to balance public policy interests and enact law. This court's limited function here is to determine whether RCW 9.46.240, which criminalizes the transmission of gambling information via the Internet, violates the dormant commerce clause. It does not.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, and DEBRA L. STEPHENS, Justices.
NOTES
[1] The Internet gambling ban does not include wagering on horse races, which is not considered "gambling" under chapter 9.46 RCW, see RCW 9.46.0237, and is treated uniquely among other forms of wagering under federal law, see 15 U.S.C. §§ 3001-3007.
[2] A "`wire communication facility'" is any instrumentality used to transfer information by wire, cable, or a like vehicle. 18 U.S.C. § 1081.
[3] knowingly transmits or receives gambling information by telephone, telegraph, radio, semaphore, the internet, a telecommunications transmission system, or similar means, or knowingly installs or maintains equipment for the transmission or receipt of gambling information shall be guilty of a class C felony subject to the penalty set forth in RCW 9A.20.021. However, this section shall not apply to such information transmitted or received or equipment installed or maintained relating to activities authorized by this chapter or to any act or acts in furtherance thereof when conducted in compliance with the provisions of this chapter and in accordance with the rules adopted under this chapter.
RCW 9.46.240.
[4] The question here is not whether the State discriminates between Internet poker and Internet wagering on horse racing, for example. First, the relevant discrimination here is against interstate commerce for the benefit of in-state economic interests, not discrimination among various forms of wagering. Second, the legislature is permitted to ban activities piecemeal when not for the purpose of simple protectionism for instance, to limit the prevalence of wagering or to limit on-line wagering only to already highly regulated areas. See RCWA 9.46.240 Notes; Clover Leaf Creamery Co., 449 U.S. at 467, 471-72, 101 S.Ct. 715.
[5] This is an unsurprising statement since running such a web site in Washington would constitute a felony under RCW 9.46.240, preventing Washington businesses from entering the Internet gambling market.
[6] A discriminatory state law can still be upheld where it is necessary to achieve an important state interest unrelated to economic protectionism. See, e.g., Mt. Hood Beverage Co., 149 Wash.2d at 110, 63 P.3d 779.
[7] This conclusion may appear abrupt or only loosely anchored to the more rigid distinctions that normally appear as hallmarks of legal reasoning. It is a by-product of the ethereal nature of the dormant commerce clause analysis, a specter that has haunted courts since it materialized from article I, section 8, clause 3 of the United States Constitution. Put simply, how does a court take a vaguely quantified and unitless measure of the burden on interstate commerce and then compare it to an equally vague and unitless measure of a benefit to a state interest? Justice Scalia likened this comparison to determining "whether a particular line is longer than a particular rock is heavy." Bendix Autolite Corp. v. Midwesco Enters., Inc., 486 U.S. 888, 897, 108 S.Ct. 2218, 100 L.Ed.2d 896 (1988) (Scalia, J., concurring). Justice Thomas simply viewed comparisons such as this as having "no principled way to decide" them. United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 353, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007) (Thomas, J., concurring). Thankfully, here, whether the burden on interstate commerce is indeed sufficient to be comparable to the state benefit does not affect the outcome. If the burden is not, RCW 9.46.240 does not violate the dormant commerce clause, with a small burden on interstate commerce not "clearly excessive" in light of a substantial state interest. And even if the burden is comparable, as we conclude here, the road is longer, as set forth below, but the result is the same.
[8] One might argue, if some individuals ignore the ban and gamble on-line, regulation would decrease the ills of Internet gambling because those individuals would be exposed to less harm gambling on-line under Washington regulation than under no Washington regulation, as occurs under the ban. But again, such arguments seek to rebalance public policy concerns. The judiciary in not in a position to agree or disagree with the legislature's balancing of public policy interests or its determination of which citizens it will "save."
[9] Rousso cites Wunnicke for the proposition that state regulation burdening foreign commerce is more heavily scrutinized, see 467 U.S. at 100, 104 S.Ct. 2237, but this burden on foreign commerce is present whether Washington bans or regulates Internet gambling.
[10] For example, the United States defended various federal gambling restrictions (including the illegal gambling business act of 1970, 18 U.S.C. § 1955, and the Wire Act) after Antigua and Barbuda alleged the United States violated the World Trade Organization's General Agreement on Trade in Services. See REPORT OF THE APPELLATE BODY, WORLD TRADE ORGANIZATION, UNITED STATES MEASURES AFFECTING THE CROSS-BORDER SUPPLY OF GAMBLING AND BETTING SERVICES ¶ 377, WT/DS285/AB/R (Apr. 7, 2005), available at http:// www.wto.org/english/tratop_e/dispu_e/285abr_e. pdf. Antigua and Barbuda also challenged various state laws, but those issues were dismissed for failure to establish a prima facie case. Id.
[11] Considering Internet gambling organizations would have to revamp their entire systems to accommodate the Washington regulations, losing Washington players might actually impose less of a burden. A restaurant might be less affected by having fewer customers than by having to change the way it prepares its food, to limit its ingredients, to scrutinize its customers in a certain way, and to be subject to unannounced raids.