# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of: | DIVISION ONE |
| | No. 75319-3-I |
| J.N., | PUBLISHED OPINION |
| Appellant. | FILED: August 28, 2017 |

DWYER, J. — J.N. appeals from a trial court's order denying his motion to be physically present at his mental illness civil commitment hearing. On appeal, J.N. contends that King County Superior Court Local Mental Proceeding Rule (LMPR) 1.8(b), which requires all civil commitment respondents[1] at certain hospitals to appear by video for their hearings, violates his statutory right to be physically present at such hearings. We agree and reverse.

I

Pursuant to the involuntary treatment act (ITA), codified at chapter 71.05 RCW, individuals who pose a risk of harm to themselves or others may, following a hearing, be involuntarily committed for treatment. The King County Superior

---

[1] We use the statutory term "respondent" to refer to the individual subject to the petition for involuntary commitment.

Court holds such hearings at its designated ITA court, located in the Harborview Medical Center.

Historically, respondents have been transported to and from the ITA court by van or, if the respondent requires a gurney for medical or safety reasons, by ambulance. In 2012, King County Crisis and Commitment Services (CCS) contracted with a private ambulance provider to secure transportation and monitoring services for respondents. However, in March 2015, the ambulance provider notified CCS that it was terminating the contract and would no longer provide transportation of respondents by ambulance except from those hospitals for which it already had an existing contract. CCS has been unable to procure an alternative ambulance provider for these services.

In response to the loss of ambulance services for ITA hearings, the King County Superior Court issued an emergency order establishing temporary protocols for ITA hearings by video. The emergency order permitted respondents who were hospitalized at certain facilities in King County, and who required ambulance transportation, to appear for their ITA hearing by video conference. The emergency order was extended multiple times. The superior court leadership concluded that the use of video hearings for respondents "who are unable to travel by van to ITA Court is a viable option for a temporary period until the Court, CCS, the hospitals and other stakeholders can determine if other options exist."

Conducting some hearings in person and others via video conferencing proved not ideal. The judicial officers responsible for ITA court proceedings

noted that whether a particular respondent would be transported by van to the ITA court or appear by video could change at the last minute, which in turn impacted where the respondent's attorney needed to be for the hearing.[2] The judicial officers also believed that video conferencing was often more humane than physically transporting respondents and having them wait extended periods for their hearings to commence. Finally, the judicial officers noted that they had received consistently favorable feedback from the respondents who had previously appeared by video.[3]

To address these concerns, the superior court adopted LMPR 1.8. Unlike the emergency order, LMPR 1.8 does not differentiate between those respondents who require ambulance transportation and those who are eligible for van transportation. Rather, LMPR 1.8(b) requires that *all* respondents hospitalized at five specific hospitals appear via video unless the respondent files a motion to request an in-person hearing and the court finds "good cause" for granting the motion.

J.N. was detained at Navos Mental Health Solutions in West Seattle on February 12, 2016. Navos filed a petition to detain J.N. for up to an additional 90 days of inpatient treatment, but J.N. was ultimately released on February 23,

---

[2] Respondents' attorneys were always to be with the respondent. Thus, they were either in court or at the petitioner's hospital, as the case may be. Similarly, the judge was in court for in-person hearings but in chambers for video hearings.

[3] However, the superior court leadership recognized that "having defense attorneys, prosecutors, court evaluators, witnesses, and interpreters located in different buildings has been difficult for the defense attorneys—who want to ensure that their clients have an adequate opportunity to have meaningful discussions with them, their family members, their case managers, and court evaluators about their options for treatment or a hearing."

2016, after agreeing to an order for 90 days of less restrictive involuntary mental health treatment in an outpatient setting.

On April 21, 2016, J.N. was admitted to the Harborview Medical Center. The medical team at Harborview referred J.N. to a designated mental health professional for evaluation. The designated mental health professional then filed a petition for revocation of J.N.'s less restrictive order.

J.N. was promptly transported to and admitted by Navos pending his revocation hearing. Navos is one of the facilities at which, pursuant to LMPR 1.8(b), all respondents are required to appear by video conference for their commitment hearings.

On April 26, 2016, J.N. met with his attorney. J.N. and his attorney discussed and decided to request an in-person hearing at Harborview. Alternatively, J.N. requested that an in-person hearing take place at Navos with all parties, witnesses, and the judge physically present. The following day, J.N. filed a motion to bar the hearing by video.

The trial court heard argument on J.N.'s motion. The trial court denied the motion. J.N.'s revocation hearing was conducted by video conference. The trial court ordered 90 days of inpatient hospitalization.[4]

---

[4] The parties recognize that this matter is now moot but ask us to resolve the issues herein as they are matters of significant public interest. No Washington case has addressed whether respondents in a civil commitment proceeding have a statutory right to be physically present at commitment hearings. "'[T]he need to clarify the statutory scheme governing civil commitment is a matter of continuing and substantial public interest.'" In re Det. of LaBelle, 107 Wn.2d 196, 200, 728 P.2d 138 (1986) (quoting Dunner v. McLaughlin, 100 Wn.2d 832, 838, 676 P.2d 444 (1984)). We choose to address this issue.

Because we decide this case on statutory grounds, we need not address the constitutional issue raised. Similarly, we choose not to address J.N.'s assertion regarding his right to counsel.

II

J.N. contends that he has a statutory right to be physically present at his revocation hearing.

A

The parties have spent significant time addressing the public policy concerns surrounding this issue. But these concerns are better addressed to the legislature. Indeed, "[i]t is the role of the legislature, not the judiciary, to balance public policy interest and enact law." Rousso v. State, 170 Wn.2d 70, 92, 239 P.3d 1084 (2010). "Article 2, section 1, of the Washington State Constitution vests all legislative authority in the legislature and in the people." In re Chi-Dooh Li, 79 Wn.2d 561, 577, 488 P.2d 259 (1971); see CONST. art. II, § 1.

"The courts are not in a position to agree or disagree with our legislature's balancing of public policy interests." Nw. Animal Rights Network v. State, 158 Wn. App. 237, 246, 242 P.3d 891 (2010).

> Indeed, the judiciary's making such public policy decisions would not only ignore the separation of powers, but would stretch the practical limits of the judiciary. See Brown v. Owen, 165 Wn.2d 706, 718-19, 206 P.3d 310 (2009) (recognizing the separation of powers implicit in the Washington Constitution and the relevance of justiciability concerns like those addressed by the federal political question doctrine (citing Baker v. Carr, 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962))). This court is not equipped to legislate what constitutes a "successful" regulatory scheme by balancing public policy concerns, nor can we determine which risks are acceptable and which are not. These are not questions of law; we lack the tools. [The plaintiff], "in order to succeed in this action, ask[s] the Court to enter upon policy determinations for which judicially manageable standards are lacking." Baker, 369 U.S. at 226. Such is beyond the authority and ability of the judiciary.

Rousso, 170 Wn.2d at 88 (second alteration in original). Rather, our function here is limited to statutory interpretation.

We review issues of statutory interpretation de novo. Fiore v. PPG Indus., Inc., 169 Wn. App. 325, 333, 279 P.3d 972 (2012). "The goal of statutory interpretation is to discern and carry out legislative intent." Bennett v. Seattle Mental Health, 166 Wn. App. 477, 483, 269 P.3d 1079 (2012). In considering the legislative intent, "the primary emphasis is on what the statute meant to members of the legislature which enacted it." 2A Norman J. Singer, Statutes and Statutory Construction § 45.08, at 40 (6th ed. 2000). Discerning the enacting legislature's understanding of the words used in the bill passed is the key to identifying legislative intent.

> The intent criterion orients the judge to the point of view of the enacting legislature. Because of the *limited* number of persons whose "intent" is thus involved, it becomes natural to think of mental images in the minds of individual *subject* legislators and look for specific and direct evidence in legislative history to indicate what members of the enacting legislature had in mind.

2A Singer, supra, § 45.08, at 41. "The courts are bound to determine the intent of the legislature by the language which was actually used and have no right to give any meaning to such language other than that conveyed by the words in which the legislative will was expressed." 2A Singer, supra, § 45.08, at 48.

To determine legislative intent, we first look to the language of the statute. Bennett, 166 Wn. App. at 483. If the statute's meaning is plain on its face, we must give effect to that plain meaning as an expression of legislative intent. Cannabis Action Coal. v. City of Kent, 180 Wn. App. 455, 470, 322 P.3d 1246

- 6 -

(2014) (quoting <u>TracFone Wireless, Inc. v. Dep't of Revenue</u>, 170 Wn.2d 273, 281, 242 P.3d 810 (2010)), <u>aff'd</u>, 183 Wn.2d 219, 351 P.3d 151 (2015).

Where the legislature has not defined a term, we may look to dictionary definitions, as well as the statute's context, to determine the plain meaning of the term. <u>Buchheit v. Geiger</u>, 192 Wn. App. 691, 696, 368 P.3d 509 (2016). Additionally, we may examine related statutes to determine the legislative understanding of a term. <u>S. Martinelli & Co. v. Dep't of Revenue</u>, 80 Wn. App. 930, 939, 912 P.2d 521 (1996).

B

Pursuant to the ITA, respondents facing 90-day commitment hearings "shall be present at such proceeding, which shall in all respects accord with the constitutional guarantees of due process of law and the rules of evidence pursuant to RCW 71.05.360(8) and (9)."[5] RCW 71.05.310.

J.N. contends that "present," as used in this context, requires the *physical* presence of respondents at civil commitment hearings. The State, conversely, asserts that video presence is sufficient to satisfy the statute.

The ITA does not define the word "present." The dictionary definition of the word is also unhelpful, as "present" is defined both as "being in one place and not elsewhere" and "being within reach, sight, or call or within contemplated

---

[5] As a preliminary matter, we note that this language contemplates a respondent's presence at a proceeding that is otherwise conducted in accordance with constitutional guarantees and the rules of evidence. Thus, presence is a statutory protection that is coupled with constitutional protections.

limits." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1793 (2002).[6] Thus, standing alone, the dictionary definition can support either party's position.

But we do not consider the word "present" in a vacuum. Rather, the term is contextualized by the surrounding language and by the legislative understanding of the term at the time that it was used. Notably, the ITA does not require that respondents be present *for* the proceeding but, rather, that they be "present *at* such proceeding." RCW 71.05.310 (emphasis added). Similarly, the legislature did not choose to require that respondents "participate in such proceeding." Nor did the legislature choose to require that respondents "be represented at such proceeding." The legislature's choice to guarantee to respondents the right "to be present *at* such proceeding" is explicit. It constitutes a policy choice made by the legislature. Viewing this phrase "shall be present at such proceeding" in the context of a statute enacted in 1973, we conclude that the ITA unambiguously requires the physical presence of respondents at their civil commitment proceeding. Our conclusion is supported by both the history of civil commitment proceedings in Washington and by the legislature's understanding of the term "present" at the time that the ITA was enacted.

C

The history of civil commitment in Washington dates back to territorial days and demonstrates that physical presence of respondents has *always* been a norm of such proceedings. Section 1632 of the Code of 1881 read:

---

[6] These definitions have not changed since the enactment of the ITA. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1793 (1971).

> The probate court of any county in this territory, or the judge thereof, upon application of any person under oath, setting forth that any person by reason of insanity is unsafe to be at large, or is suffering under mental derangement, *shall cause such person to be brought before said court or judge* at such time and place as the court or judge may direct; and shall cause to appear at said time and place, one or more respectable physicians who shall state under oath in writing, their opinion of the case, which opinion shall be carefully preserved and filed with the other papers in the case; and if the said physician or physicians shall certify to the insanity or idiocy of said person, and it appear to the satisfaction of the court or judge that such is the fact, said court or judge shall cause such insane or idiotic person to be taken to and placed in the hospital for the insane in Washington territory.

CODE OF 1881, ch. 110, § 1632, at 277 (emphasis added).

The requirement of physical presence continued into statehood. For example, the Code of 1922 required that all participants in a commitment hearing be gathered together in the same room:

> The superior court of any county in this state, or the judge thereof, upon the application of any person under oath, setting forth that any person, by reason of insanity, is unsafe to be at large, *shall cause such person to be brought before him*, and he shall summon to appear *at the same time and place* two or more witnesses, who shall testify, under oath, as to conversations, manners, and general conduct upon which said charge of insanity is based.

REM. REV. STAT. § 6930 (1922) (emphasis added). The session laws of 1951 concerning commitment hearings similarly provided that "[w]henever any person *shall be brought before the court* for examination and hearing on application for involuntary hospitalization, the court . . . may summon witnesses and require the production of documentary evidence." LAWS OF 1951, ch. 139, § 30, at 351 (emphasis added).

- 9 -

In 1973, our legislature enacted a new statutory scheme for commitment proceedings. Codified at chapter 71.05 RCW, the statutory scheme provides for various lengths of detention for evaluation and treatment and for various decision-makers. The legislature's hope was to "prevent inappropriate, indefinite commitment of mentally disordered persons." RCW 71.05.010(1)(b). The 1973 statutory scheme adopted some features of the earlier commitment statutes but also sought to provide greater protections for respondents. In re Det. of S.E., No. 74917-0-I, slip op. at 17 (Wash. Ct. App. July 10, 2017) http://www.courts.wa.gov/opinions/pdf/749170.pdf.

In enacting this statutory scheme, the legislature provided that respondents "shall be present at" the civil commitment hearings. This language is consistent with the history of civil commitment proceedings and suggests that the legislature envisioned physical presence. Permitting a commitment hearing in which the respondent is prevented from participating in person is contrary to the intent of the legislature that enacted the ITA.

D

The history of civil commitment proceedings in Washington establishes that the respondent's physical presence during the commitment hearing has always been expected. This expectation certainly did not change when the legislature enacted the ITA in 1973—before modern video conferencing technology came into existence. Indeed, a review of our case law establishes that allowing live witness testimony from remote locations is a recent development.

The Superior Court Civil Rules, for example, have long favored the taking of witness testimony in open court. As technology advanced, courts began to permit telephonic testimony by witnesses when all parties consented. Kinsman v. Englander, 140 Wn. App. 835, 844, 167 P.3d 622 (2007). It was not until 2010, however, that CR 43 was amended to expressly permit testimony by contemporaneous transmission from a different location "[f]or good cause in compelling circumstances and with appropriate safeguards." CR 43(a)(1); In re Marriage of Swaka, 179 Wn. App. 549, 553, 319 P.3d 69 (2014).

The situation is similar in the criminal context. Although the civil rules were amended to accommodate new telephonic technology, no such provision exists in the criminal rules. See State v. Cayetano-Jaimes, 190 Wn. App. 286, 297, 359 P.3d 919 (2015) (concluding that CR 43 gave the trial court discretion to permit testimony by telephone in a criminal case). The sparse case law addressing video or telephonic testimony by a criminal defendant's witness further supports the understanding that remote testimony is a relatively new development and was not within the contemplation of the 1973 legislature. Indeed, challenges to a court's decision permitting live witness testimony via Skype[7] or a similar service did not arise until after CR 43 was amended. See Swaka, 179 Wn. App. at 552-53; State v. Cates, No. 68759-0-I, slip op. at 9 (Wash. Ct. App. Jan. 21, 2014) (unpublished), http://www.courts.wa.gov/opinions/pdf/687590.pdf.

---

[7] Skype is a live video chat and long-distance voice calling service.

The legislators who enacted the ITA in 1973 would not have understood "present" to mean anything other than physical presence. Our role is to give effect to the legislature's intended meaning. Accordingly, we conclude that the ITA requires that respondents in civil commitment proceedings be physically present for such proceedings.

Reversed.

We concur:

No. 75319-3-I, In the Matter of the Detention of J.N.

TRICKEY, A.C. J. (dissenting) — I respectfully dissent.

## Statutory Right to be Present

The term "present" in RCW 71.05.310 is not defined. The Webster's Third New International Dictionary definition of "present" as "being within reach, sight or call . . ." is broad enough to encompass appearance by the video conferencing procedure King County Superior Court adopted in LMPR 1.8. As noted by the majority, this dictionary definition has not changed since the legislature enacted the ITA.

Here, J.N. was given the opportunity to observe and participate in his 90-day involuntary commitment hearing by a video conference with appropriate safeguards. The video conference put J.N. within both sight and call of the proceeding, two of the terms listed in the dictionary definition of "present." Thus, I disagree that RCW 71.05.310 gives the appellant a statutory right to be physically present at the 90-day commitment hearing.

## Due Process

Moreover, the phrase "present at" must be read in the context of the entire sentence in RCW 71.05.310, which provides: "The person shall be present at such proceeding, which shall in all respects accord with the constitutional guarantees of due process of law and the rules of evidence pursuant to RCW 71.05.360(8) and (9)." The plain language of the statute does not grant J.N. a separate statutorily created right to be physically present at a civil commitment hearing. Instead, the

plain language indicates that the legislature intended to link J.N.'s rights in his civil commitment hearing to the protections accorded by constitutional due process.

Civil commitment is a "massive curtailment of liberty." Humphrey v. Cady, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972). "There is no question that due process guaranties must accompany involuntary commitment for mental disorders." In re Harris, 98 Wn.2d 276, 279, 654 P.2d 109 (1982).

"However, due process is a flexible concept. At its core is a right to be meaningfully heard, but its minimum requirements depend on what is fair in a particular context." In re Det. of Stout, 159 Wn.2d 357, 370, 150 P.3d 86 (2007) (citing Mathews v. Eldridge, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).

Here, the trial court appropriately weighed the Mathews factors of the private interest affected, the risk of erroneous deprivation of that interest, and the governmental interest in determining there was no due process violation in this case.[1]

I would affirm the decisions of trial court, and conclude there was no right to counsel violation.

Trickey, ACJ

---

[1] Clerk's Papers at 113-30.